**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE YAHOO! INC. SECURITIES
LITIGATION
_____

VINCE BONATO,

      Plaintiff,

  v.

YAHOO INC., CAROL A. BARTZ, JERRY
YANG, and TIMOTHY R. MORSE,

      Defendants.
_____/

No. C 11-02732 CRB

**ORDER GRANTING MOTION TO
DISMISS**

This is a proposed securities litigation class action against Yahoo! Inc. and three

Yahoo executives, Carol Bartz, Jerry Yang, and Timothy Morse, (collectively "Defendants"),

alleging Defendants made materially false and misleading statements regarding Yahoo's

investment in Alipay, a Chinese company.  The case is brought on behalf of all persons who

purchased or otherwise acquired Yahoo stock between April 19, 2011 and July 29, 2011.

Plaintiffs allege Defendants violated the Securities Exchange Act of 1934 by making

materially false and misleading statements about the Company's investment in Alibaba

Group Holdings Limited ("Alibaba" or "Alibaba Group").  Defendants move to dismiss the

complaint, arguing Plaintiffs fail to state a Section 10(b) claim because Defendants had no

duty to disclose the allegedly omitted information; that Plaintiffs fail to plead a strong

inference of scienter; and that the claim against Defendant Jerry Yang fails because he did

**United States District Court**
For the Northern District of California

1    not make any of the challenged class period statements.  As the Court finds Plaintiffs fail to

2    state a Section 10(b) claim, the motion to dismiss is GRANTED.

3    **I.      FACTUAL BACKGROUND**

4          Yahoo is a global digital media company headquartered in Sunnyvale, California.

5    During the class period, Carol A. Bartz was Yahoo's CEO, President, and a Director;

6    Timothy R. Morse was CFO; and Jerry Yang was a Director and Chief Yahoo!.

7    Consolidated Amended Complaint ("CAC") ¶¶ 29-32.

8          Yahoo acquired 46 percent of the Alibaba Group in 2005.  CAC ¶¶ 34-35.  The

9    Alibaba Group was a privately held Cayman Islands e-commerce company based in China.

10   Id. ¶ 35.  Softbank Corp. ("Softbank"), a Japanese corporation, owned approximately 30

11   percent of Alibaba Group.  Id. ¶¶ 4, 35, 54.  Jack Ma, a Chinese businessman, owned

12   approximately 25 percent of Alibaba Group.  Id.  The Alibaba Group owned 70 percent of

13   Alibaba.com, an online marketplace for businesses that is a public company, and several

14   private companies, including Taobao, a Chinese equivalent of eBay; Alipay, an online

15   payment business similar to PayPal; Alibaba Cloud Computing, a developer of cloud

16   computing services; and China Yahoo!, a Chinese-Internet portal acquired from Yahoo in

17   2005.  Id. ¶¶ 5, 34, 36.

18         When the Alibaba Group investment was announced in October 2005, Yahoo stated

19   that the investors had "created one of the largest Internet companies in the fastest-growing

20   Internet market" and that the Alibaba Group was "the only Internet company in China with a

21   leading position in key growth sectors including business-to-business e-commerce, consumer

22   e-commerce, online payment, communications and search."  Id. ¶ 34.  Plaintiffs allege that

23   Defendants reported the carrying value of the investment and repeatedly stated that the actual

24   value of the investment was billions of dollars higher and would be "worth a whole lot more

25   in the future."  Id. ¶¶ 42-43, 49, 52-54, 99-123.[1]  Moreover, Plaintiffs allege Defendants

26   made numerous additional statements about the importance and value of the investment,

27   _____

28         [1] Yahoo reported the carrying value of its investment in the Alibaba Group at cost in "investments in equity interests," and the reported amount of the investment was approximately $2.3 billion during the Class Period.  CAC ¶¶ 5, 37-39.

United States District Court
For the Northern District of California

including specific statements about Alipay.  Id. ¶¶ 34-35, 40-44, 48-54, 99-123.  Investors and analysts agreed and reported that Alipay was worth $6 billion.  Id. ¶¶ 45-47.

Defendants stated to investors that they were "always evaluating" the investment through Yang's position on the Alibaba Group board and Yahoo's "team of very strong financial experts" that included Yahoo-appointed legal and finance personnel at the Alibaba Group and a Yahoo compliance officer.  Id. ¶¶ 48-54, 92.  They also received monthly reports that included the financial statements of each subsidiary and quarterly reports that included explanations of any significant movements from the prior quarter.  Id. ¶ 93.  Yahoo reported its share of the results of Alibaba Group "one quarter in arrears, within earnings in equity interests in the consolidated statements of income."  Id. ¶ 37.  Yahoo reported this information in footnotes to the financial statements that were included in its quarterly and annual reports filed with the Securities and Exchange Commission on Forms 10-Q and 10-K, respectively.  Song Decl. (dkt. 72) Ex. 1 at 10; Ex. 3 at 10; Ex. 5 at 21-23; Ex. 9 at 8.[2] During quarterly earnings calls, Yahoo reported the value of its indirect stake in the publicly traded securities of Alibaba.com, which excluded the value of Alibaba Group's privately held businesses, such as Alipay.  CAC ¶¶ 104, 109, 119; Ex. 2 at 5; Song Decl. Ex. 4 at 4;

---

[2] Defendants request that the Court take judicial notice of the twenty exhibits attached to the Song Declaration.  Exhibits 1-15 and 17-19 are incorporated by reference into the CAC, and thus, appropriate for the Court to consider.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  Exhibit 20 is accounting standards related to variable interest entities ("VIEs").  "[J]udicial notice is appropriate for . . . accounting rules as they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'"  In re Asyst Techs., Inc. Derivative Litig., No. 06-4669, 2008 WL 2169021, at *1 n.1 (N.D. Cal. May 23, 2008).

Plaintiffs oppose the Court taking judicial notice of Exhibit 16, which is a certified English translation of a Chinese language excerpt from Exhibit 15 page 14.  In general, courts have taken judicial notice of certified translations of material relied upon by the Complaint, but in situations where the authenticity of the document is not at issue.  See, e.g., Grolsche Bierbrouwerij Nederland, B.V. v. DoveBid, Inc., No. 11-763, 2011 WL 3359913, at *2 n.3 (N.D. Cal. Aug. 2, 2011).  Plaintiffs argue that the translation in Exhibit 16 is different from the translation on page 14 of Exhibit 15, and thus, the Court should not take notice of something that will "generate an evidentiary record and then weigh evidence."  In re Network Equip. Techs., Inc. Litig., 762 F. Supp. 1359, 1363 (N.D. Cal. 1991).  Essentially, the authenticity of the translation is at issue as it conflicts with Exhibit 15, of which it is supposed to be another translation.  Defendants argue that the inconsistency is why they submitted the translation, as it shows that the allegations are unreliable, and argues that the Court "need not accept as true allegations contradicting documents that are referenced in the complaint."  Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).  The Court DENIES the request for judicial notice as to Exhibit 16.

Ex. 7 at 7. Yahoo does not appear to have separately reported Alipay's financial results or any valuation of Alipay.

As alleged by Plaintiff, in China, Internet businesses are generally subject to regulations requiring that they be owned by Chinese nationals. CAC ¶ 56. To meet these requirements, Internet businesses with non-Chinese investors are often formally owned by Chinese nationals, but are structured with contractual agreements that give control and economic benefits to the non-Chinese investors. Id. ¶¶ 3 n.1, 56. These arrangements are known as Variable Interest Entities ("VIEs"). Id. With a VIE structure, the non-Chinese investors can become the primary beneficiaries of the VIE's revenues, earnings, and profits, and consolidate the VIE's financial results with their own.

In June 2010, the Bank of China ("BoC") adopted new regulations that restricted licenses to companies incorporated in China and required foreign-owned companies to follow special rules to obtain a license, including approval by the State Council. Id. ¶¶ 58-59. The *Financial Times* reported that the new regulations "explicitly excluded companies with foreign capital from the new regulatory framework" which created a problem "for everyone with a shred of foreign investment." Id. ¶ 60. It also reported that the new regulations "could force . . . Alibaba to restructure their shareholdings" and that it was "understood that Alibaba's management is considering hiving Alipay off." Id. Ma and Alipay CFO Jing Xiandong ("Jing") feared that State Council approval would take too long and possibly result in the destruction of Alipay if the State Council rejected the application. Id. ¶ 59.

On August 6, 2010, the Alibaba Group did restructure its shareholdings when all of Alipay's shares were transferred to Zhejiang, a Chinese company majority-owned by Ma, for approximately $46 million – less than 1% of Alipay's estimated $6 billion value. CAC ¶¶ 62-63. Ma stated that the Alibaba Group board – which included Yang – approved the Alipay share transfer and that it was reflected in the company's board of director meeting minutes. Id. ¶¶ 68-74. At this time Alibaba Group controlled Alipay through a series of agreements that created a VIE arrangement and consolidated Alipay's financial results. Id.

4

¶¶ 9, 64, 72; Song Decl. Ex. 12 at 9, 22-23.  The VIE arrangement gave the Alibaba Group "de facto control" of Alipay through the Zhejiang company.  Id. ¶¶ 9, 64.

In January 2011, Ma terminated the control agreements between Alibaba Group and Zhejiang after receiving two letters from the BoC asking the Alibaba Group to declare whether it had control agreements connected to Alipay.  CAC ¶ 75.  Ma stated to the press that he believed that Alipay would not have received a license if there were control agreements in place.  Id.  Alipay CFO Jing stated that the only option was to promptly terminate the control arrangement.  Id. ¶ 77.

Plaintiffs argue that Yahoo misled investors after the July 2010 transfer of Alipay (but while the VIE was in place), by continuing to speak as though Yahoo still had an ownership interest in Alipay that added significant value to the overall investment.  In Yahoo's 2Q10 Form 10-Q filed on August 9, 2010 and signed by Bartz and Morse, Defendants reported that Yahoo's equity investment in the Alibaba Group was $2.2 billion and that its proportionate share of the Alibaba Group's equity was $1.6 billion, and warned that Yahoo's stock price might fluctuate if there were variations in the operating performance of the Alibaba Group.  CAC ¶ 99.  During Yahoo's 3Q10 earnings call on October 19, 2010, Bartz and Morse emphasized that the actual value of the investment was greater than the reported $2.2 billion "equity investment" value and stated, "we know there's tremendous value in the businesses they're growing.  It's an important investment."  Id. ¶¶ 103-105.  The next day Bartz told investors that "everybody is salivating because it [is] . . . such a good investment."  Id. ¶ 106.  In Yahoo's 3Q10 Form 10-Q filed on November 8, 2010, and signed by Bartz and Morse, Defendants reported that Yahoo's equity investment in the Alibaba Group was $2.2 billion and also reported selected financial information of the Alibaba Group.  Id. ¶ 107.  They again warned that variations in the operating performance of the Alibaba Group could impact Yahoo's stock price.  Id.  On January 25, 2011, Bartz and Morse again reported that the reported $2.3 billion "equity investment" value did "not include estimates of the value of Alibaba Group's privately held businesses, most notably Taobao and Alipay."  Id. ¶ 109.  They also stated that Yahoo's "approximately 40% stake [in the Alibaba Group] has been

United States District Court
For the Northern District of California

and continues to be a great investment, . . . has a bright future [and] . . . will grow in value and continue to greatly benefit our investors over time." Id.  In the Company's 2010 Form 10-K filed on February 28, 2011, and signed by Yang, Bartz and Morse, Defendants reported that Yahoo's equity investment in the Alibaba Group was $2.3 billion.  ¶¶110-112.  They also included the operating performance warning. Id.  On February 16, 2011, Morse stated that "the strategy that they're pursuing with regard to Taobao, with regard to Alipay [is] fantastic," that management was "creating a lot of value there" and that "[i]t will be worth a lot more in the coming years than it is now." Id. ¶¶ 115-117.

Defendants contend they learned about the Alipay restructuring on March 31, 2011.  CAC ¶ 66.  Plaintiffs allege they told investors on April 19, 2011 that "as of March 31, the pretax value of our 35% stake in Yahoo! Japan and our 29% indirect stake in Alibaba.com was roughly $9.9 billion or a little less than $7.50 per share," and allegedly led investors to believe the value of the Alibaba Group investment was much higher because the reported value did "not include estimates of the value of Alibaba's privately held businesses." Id. ¶ 119.  Plaintiffs allege Defendants also failed to correct their previous statements that created the false impression that the Alibaba Group still owned and controlled Alipay.

On May 10, 2011, Defendants disclosed in Yahoo's 1Q11 Form 10-Q that 100% of Alipay's shares had been transferred to a Chinese domestic company to expedite Alipay obtaining an essential regulatory license and that Yahoo was engaged in ongoing discussions regarding the terms of the restructuring.  CAC ¶¶ 65, 122.  Plaintiffs allege that Defendants continued to mislead investors by concealing that Alipay's shares were transferred for just $46 million and that the control agreements had been terminated. Id. ¶ 123.  This unexpected negative news caused Yahoo's stock price to decline by 7.3% the following day. Id. ¶ 144.  Defendants did not disclose that they had known about the Alipay restructuring since March 31, 2011 or claim that it occurred without their knowledge. Id. ¶¶ 65, 122.

On May 12, 2011, Alipay issued a press release reporting that its shares were transferred in August 2010.  CAC ¶ 66.  On May 12, 2011, Yahoo issued a press release "in response to recent media reports regarding the timing of the restructuring of Alipay." Song

Decl. Ex. 10 at 1; CAC ¶¶ 66, 123.  Yahoo explained that it had been notified by Alibaba Group on March 31, 2011, of "two transactions that occurred without the knowledge or approval of the Alibaba Group board of directors or shareholders.  The first was the transfer of ownership of Alipay in August 2010.  The second was the deconsolidation of Alipay effective in the first quarter of 2011."  Id.  Yahoo stated that it "disclosed this restructuring in its 10-Q after discussions with Alibaba Group and obtaining a better understanding of this complex situation."  Id.  Yahoo stated that it was continuing to engage in "ongoing negotiations" with Alibaba Group and other relevant parties.  Id.  Between May 13 and July 19, 2011, Yahoo repeatedly disclosed that it was continuing discussions to resolve these issues.  CAC ¶¶ 85, 97, 131, 146. The Alibaba Group issued a press release in which it claimed that the board did know about the Alipay restructuring when it occurred. Id. ¶ 68.

These disclosures caused additional declines in Yahoo's stock price.  Id. ¶¶ 145-146. Analysts and investors were surprised and upset.  Id. ¶¶ 82-84.  As Yahoo shareholder Eric Jackson ("Jackson") put it: "the optics [were] bad," suggesting the Company "tried hiding this piece of news."  Id. ¶ 82.  Deutsche Bank analyst Jeetil Patel ("Patel") reported: "[S]urprisingly, Yahoo! did not disclose this event upon receipt of notification (March 31st) or during earnings in late April, opting for disclosure in its 10Q six weeks later."  Id. Jefferies & Co. analyst Youssef Squali also questioned how the transactions could have occurred without the knowledge of the Alibaba Group board and how defendants could not have known about the Alipay share transfer when it occurred right after the new regulations were issued by the BoC.  Id. ¶ 83.

During Yahoo's May 25, 2011 investor day Yang and Bartz refused to answer any questions, citing a self-imposed gag order.  CAC ¶¶ 84-90.  On June 14, 2011, Ma held a press conference and gave an interview to *China Entrepreneur Magazine* during which he made numerous statements indicating Defendants may have known about the Alipay share transfer and termination of the control agreements when those transactions occurred.  Id. ¶¶ 70-81, 124-125.  Defendants did not deny or address Ma's statements.  Id. ¶¶ 126-131.

Instead, Yahoo, the Alibaba Group and SoftBank issued a joint statement on June 21, 2011 in which they announced another self-imposed gag order.  Id. ¶ 126.

On July 29, 2011, Yahoo disclosed that it had entered into an overall Framework Agreement with the Alibaba Group and other relevant parties to resolve the outstanding issues related to Alipay.  CAC ¶ 132; Song Decl. Ex. 12 at 2, 25.  The Framework Agreement included Alipay continuing to provide payment services to the Alibaba Group, Alipay paying the Alibaba Group a royalty and software technology service fee and the Alibaba Group receiving no less than $2 billion and not more than $6 billion from an Alipay IPO or other liquidity event.  Id. ¶¶ 19, 132.  Yahoo's stock price declined to $13.10.  Id. ¶¶ 133-137.

After the Class Period, Bartz was fired on September 6, 2011.  CAC ¶¶ 138-139.  Daniel Loeb, whose hedge fund owns 5.1% of Yahoo's stock, sent three letters to the Board in which he cited the "Alipay debacle" in a litany of failings that had "destroyed value for all Yahoo stakeholders" and demanded the removal of Yang from the Board.  Id. ¶¶ 140-142.  Yang announced he was resigning from the Yahoo Board in January 2012.

Less than four weeks after Yahoo's May 10, 2011 disclosure, but before the Framework Agreement was reached, the first of two securities fraud class actions was filed in this Court.  Dkt. 1.  The Court consolidated the actions and appointed Pension Trust Fund for Operating Engineers as Lead Plaintiff ("Plaintiff").  Dkts. 63, 65.  On December 15, 2011, Plaintiff filed the CAC.  Dkt. 68.  Plaintiff purports to represent a class of investors who purchased Yahoo's common stock between April 19, 2011, and July 29, 2011.  CAC ¶ 1.  Plaintiff alleges that Defendants made false and misleading statements in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and] SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and asserts control-person claims under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).

Plaintiff challenges statements made on two dates during the Class Period.  CAC ¶¶ 119, 122.  First, Plaintiff alleges that statements made in Yahoo's April 19, 2011 earnings press release and conference call were false and misleading because Defendants did not

**United States District Court**
For the Northern District of California

1  disclose information about the Alipay restructuring.  CAC ¶¶ 119, 121.  Second, Plaintiff

2  alleges that Defendants "reveal[ed]" the transfer of Alipay's shares in Yahoo's May 10, 2011

3  10-Q, but "continued to mislead" by not disclosing additional details relating to transactions

4  underlying the restructuring of Alipay.  Id. ¶¶ 122-23.  Plaintiffs allege that "most" of these

5  details were "reveal[ed]" two days later in Yahoo's May 12, 2011 press release.  Id. ¶ 123.

6  Defendants now move to dismiss the CAC for failing to state a claim upon which relief can

7  be granted.

8  **II.    LEGAL STANDARD**

9           Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed

10  for failure to state a claim upon which relief may be granted.  Dismissal may be based on

11  either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

12  cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

13  1990).  For purposes of evaluating a motion to dismiss, a Court "must presume all factual

14  allegations of the complaint to be true and draw all reasonable inferences in favor of the

15  nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  A

16  complaint must plead "enough facts to state a claim to relief that is plausible on its face."

17  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550

18  U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that

19  allows the court to draw the reasonable inference that the defendant is liable for the

20  misconduct alleged." Id.

21           Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure

22  9(b), which requires a party "alleging fraud or mistake [to] state with particularity the

23  circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "requires an

24  account of the time, place, and specific content of the false representations as well as the

25  identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764

26  (9th Cir. 2007) (internal quotation marks omitted).  Security fraud claims must also meet the

27  heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA):

28  "[T]he complaint shall specify each statement alleged to have been misleading, the reason or

1   reasons why the statement is misleading, and, if an allegation regarding the statement or

2   omission is made on information and belief, the complaint shall state with particularity all

3   facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1).

4       The PSLRA also requires Plaintiffs to state with particularity facts giving rise to a

5   strong inference of Defendants' scienter. See 15 U.S.C. § 78u-4(b)(2). "The inference of

6   scienter must be more than merely 'reasonable' or 'permissible'" – "it must be cogent and at

7   least as compelling as any opposing inference one could draw from the facts alleged."

8   See Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  Therefore, a court

9   "must consider plausible nonculpable explanations for the defendant's conduct." Id.

10      If a court does dismiss a complaint for failure to state a claim, the Federal Rules of

11  Civil Procedure state that the court should freely give leave to amend "when justice so

12  requires." Fed. R. Civ. P. 15(a)(2).  A court nevertheless has discretion to deny leave to

13  amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated

14  failure to cure deficiencies by amendments previously allowed, undue prejudice to the

15  opposing party by virtue of allowance of the amendment, [and] futility of amendment."

16  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v.

17  Davis, 371 U.S. 178, 182 (1962)).

18  **III.    DISCUSSION**

19      **A.    Section 10(b)**

20      To state a claim for securities fraud under Section 10(b) of the Securities Exchange

21  Act of 1934, a plaintiff must plead: (1) a misrepresentation or the use or employment of any

22  manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the

23  purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

24  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

25  Defendants argue the Plaintiffs' 10(b) claim should be dismissed for two reasons: (1) failure

26  to plead facts sufficient to establish that any Defendant made a false or materially misleading

27  statement; and (2) failure to plead facts giving rise to a "strong inference" of scienter.  As the

28

United States District Court
For the Northern District of California

Court finds that the Plaintiffs failed to plead facts sufficient to establish a false or materially misleading statement, it need not reach the issue of scienter at this time.

### 1.    Duty to Disclose and False or Misleading Statement

Plaintiffs allege that statements made on two dates during the Class Period – April 19, 2011, and May 10, 2011 – were false and misleading because Defendants did not disclose information about the Alipay restructuring at that time.  CAC ¶¶ 119-123.  Defendants argue the statements were not false or misleading because Defendants did not have a duty to disclose the information at issue.

To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was " misleading as to a material fact."  Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988).  In Basic, the Supreme Court held that this materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Id. at 231–232.

Section 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321-22 (2011).  Disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b); see also Basic, 485 U.S. at 239 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.").  Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.  Matrixx, 131 S. Ct. at 1322.

### a.    April 19, 2011 Statements

Plaintiff challenges the following statement in Yahoo's 1Q11 financial results as a false and misleading representation because it misled investors into believing that the Alibaba Group still owned and controlled Alipay, and that the value of the investment was

much greater than the $9.9 billion reported because that number did not include Taobao and Alipay:

> Finally, as of March 31, the pretax value of our 35% stake in Yahoo! Japan and our 29% indirect stake in Alibaba.com was roughly $9.9 billion or a little less than $7.50 per share. These figures are based on public market quotes and do not include estimates of the value of Alibaba's privately held businesses.

CAC ¶ 119.  Plaintiffs argue the statement was misleading because it created the false impression that the Alibaba Group still owned and controlled Alipay by failing to disclose that 100% of Alipay's shares had been transferred to Zhejiang on August 6, 2010 for $46 million, and that the VIE arrangement that gave Alibaba Group control of Alipay had been terminated on January 27, 2011.  Id. ¶¶ 119, 121.  Plaintiffs also challenge the April 19, 2011 earnings conference call where Bartz "said nothing about Yahoo's investment in the Alibaba Group."  CAC ¶ 120.

Defendants argue that the statement at issue did not speak about Alipay, and thus, they had no duty to disclose the restructuring on April 19, 2011.  Defendants argue that "Silence, absent a duty to disclose, is not misleading under Rule 10b–5."  Basic, 485 U.S. at 239. Disclosure is required under these provisions only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Matrixx, 131 S. Ct. at 1321-22.  Defendants argue that the statement is silent as to Alipay, and thus, no duty to disclose arises.  First, Defendants point out that the only Alibaba Group entity discussed was Alibaba.com, a publicly traded subsidiary of the Alibaba Group, which does not own Alipay or have any interest in Alipay.  Defendants argue they expressly disclaimed saying anything about Alibaba Group's privately held businesses  – "These figures are based on public market quotes and do not include estimates of Alibaba's privately held business."  CAC ¶ 119.  Thus, Defendants argue it was clear they were not commenting on Alipay, and in fact, were silent on the subject.

Defendants point to the Ninth Circuit's decision in Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002), to support their position that the statement is not misleading.  In Brody, the plaintiffs challenged two press releases.  At the time of the first press release, the defendant company had received an acquisition offer from a third party.  Id.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In the first press release, the defendant company provided information about a stock

2    repurchase program, but did not include any information about a possible acquisition.  Id.

3    The Ninth Circuit held this was not misleading, since there is no "completeness" requirement

4    in Rule 10b-5, and a plaintiff's complaint "must specify the reason or reasons why the

5    statements made by [defendant] were misleading or untrue, not simply why the statements

6    were incomplete."  Id.  The Court held the release might have been misleading if it had

7    affirmatively intimated that no merger was imminent, but since the release neither stated nor

8    implied anything regarding a merger, it was not actionable.  Id.

9         In the second release, the defendant stated generally that it had received "expressions

10   of interest" from potential acquirers, when in fact it had received actual proposals from three

11   different parties.  Id. at 1007.  The press release also included information that the

12   expressions were from parties who had expressed an interest in acquiring the entire company,

13   and that the company had engaged financial advisors to advise the company in connection

14   with a possible sale.  Id.  Thus, the Ninth Circuit found that the release did not give the

15   impression that the defendant had not received actual proposals from three parties, or

16   otherwise mislead readers about the stage of the negotiations.  Id.  "Instead, although the

17   press release did not provide all the information that [defendant] possessed about its possible

18   sale, the information [defendant] did provide – and the reasonable inferences one could draw

19   from that information – were entirely consistent with the more detailed explanation of the

20   merger that [plaintiffs] argue the press release should have included."  Id.

21        Defendants argue that the April 19, 2011 statement and conference call are like the

22   first press release in Brody – since Yahoo said nothing about Alipay in the earnings call or

23   the press release, it could not be misleading.  This is certainly true of the earnings call – if

24   Bartz said nothing about the Alibaba Group, there is no duty to disclose, as the Rule does not

25   contain "a freestanding completeness requirement."  Brody, 280 F.3d at 1006.

26        Plaintiffs argue that the situation is not like the first press release in Brody, which

27   "neither stated nor implied anything regarding a merger," because the 1Q11 statement made

28   explicit statements about the Alibaba Group investment but concealed its substantial

13

United States District Court
For the Northern District of California

1   impairment.  Thus, Plaintiffs argue that the statement implied something about the value of

2   the Alibaba Group investment, and was not simply silent on the matter.  Plaintiffs argue

3   additionally that the situation of the second press release does not apply because Yahoo's

4   statements created the false impression that there had been no material change to the value of

5   Yahoo's investment in the Alibaba Group.  While in <u>Brody</u> the release was not misleading

6   because it did not give the impression that the company had not received actual serious

7   proposals for acquisition, here, Plaintiffs argue that the statement was misleading by creating

8   an impression that there was <u>no</u> material change to the Alibaba Group investment, when there

9   <u>was</u> such a change.

10          The Court finds that the statement at issue here is closer to the situation of the first

11  press release in <u>Brody</u>.  First, the earnings call allegedly said nothing about the investment in

12  the Alibaba Group.  CAC ¶ 120.  Thus, it is directly analogous to the first press release.  The

13  statement itself, also states explicitly that it did "<u>not</u> include estimates of the value of

14  Alibaba's privately held business."  This is also more like the first release in that it does not

15  include any affirmative statement on the issue of value.  Moreover, a simple statement that

16  the earnings report does not include estimates of the value of the privately held businesses

17  does not necessarily mislead by creating a notion about the <u>value</u> of the privately held

18  businesses.  The strongest argument for Plaintiffs is that by saying the value of the privately

19  held businesses is not included, perhaps Yahoo is intimating that the value of those

20  businesses has not changed in any way.  Yet, this is a stretch.  "To be actionable under the

21  securities laws, an omission must be misleading; in other words it must affirmatively create

22  an impression of a state of affairs that differs in a material way from the one that actually

23  exists."  <u>Brody</u>, 280 F.3d at 1006.  Stating that the value of something is <u>not</u> included in the

24  reported valuation of something else does not affirmatively create an impression of the value

25  of that thing.

26          Plaintiffs rely on <u>Berson v. Applied Signal Technology, Inc.</u>, 527 F.3d 982, 985 (9th

27  Cir. 2008), to support their argument that the statements were misleading by creating a false

28  impression that the Alibaba Group still owned and controlled Alipay when that was no longer

14

United States District Court
For the Northern District of California

1    the case.  In <u>Berson</u>, the plaintiffs sued a construction company for alleged

2    misrepresentations in reporting backlogged work.  <u>Id.</u>  The company reported its backlog

3    figures (the value of the amount of work it had contracted for but not yet completed) in

4    financial filings without disclosing that it had received "stop-work" orders (orders

5    immediately stopping any work and allowing the customer to then unilaterally cancel the

6    contract) on some of the work reported in the backlog.  <u>Id.</u>  The Ninth Circuit found this to be

7    misleading because "once defendants chose to <u>tout</u> the company's backlog, they were bound

8    to do so in a manner that wouldn't mislead investors as to what that backlog consisted of."

9    <u>Id.</u> at 987.  "Had defendants released no backlog reports, their failure to mention the stop-

10    work orders might not have misled anyone."  <u>Id.</u>

11        Plaintiffs argue that <u>Berson</u> is directly on point because here Defendants mislead

12    investors by "touting the value of the Alibaba Group investment and concealing that it no

13    longer consisted of Alipay."  Opp'n at 13.  They argue that Defendants did speak about

14    Alipay by reporting the value of Alibaba.com and implicitly representing that the Alibaba

15    Group still owned and controlled Alipay, and that referring to "Alibaba's privately held

16    businesses" rather than "Alipay" is a distinction without a difference.  Defendants argue that

17    here there was no "touting," as there was no statement on the subject at all.

18        The Court agrees that the definitive issue is not the use of the word "Alipay."  Yet, the

19    Court finds this point not dispositive in light of the more central "touting" issue.  In <u>Berson</u>,

20    the defendant company was actively reporting the backlog as demonstrating its future

21    earnings, even though it knew that <u>issued</u> stop-work orders had decreased – at least

22    temporarily and likely permanently – the value of that backlog amount.  Here, Defendants

23    simply reported the value of the publicly traded (and thus, easily valuated) Alibaba.com, and

24    stated that value did "<u>not</u> include estimates of the value of Alibaba's privately held

25    businesses."  This is touting the value of Alibaba.com, and does perhaps imply that there is

26    some additional value from the privately held businesses that is above zero, and is not

27    included in the calculation.  Yet, it is specifically <u>not</u> a valuation of those businesses, nor

28    does it state anything else about the state or nature of those businesses.  Moreover, as the

15

United States District Court
For the Northern District of California

1  Alibaba Group had several privately held businesses, implying that these together had <u>some</u>

2  value not included in the public stock price of Alibaba.com is not misleading.

3          The question is whether the omission – that Alipay was no longer included in the

4  value of Alibaba Group's privately held businesses – "affirmatively create[d] an impression

5  of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."

6  <u>Brody</u>, 280 F.3d at 1006.  It is hard to see how a statement that expressly <u>does not value</u> the

7  privately held businesses affirmatively creates an impression that the <u>value is different</u> in a

8  material way than the actual value.  The statement itself says nothing about the value.

9          Other case law supports the conclusion that this statement is not misleading.  For

10 example, Plaintiffs argue that the situation is similar to that in <u>Philco Inv., Ltd. v. Martin</u>, No.

11 10-2785, 2011 WL 500694 (N.D. Cal. Feb. 9, 2011), where this Court found that defendant's

12 acknowledgment about discouraging news about its drug's efficacy was not misleading given

13 that it was consistent with later, more detailed disclosures about problems.  <u>Id.</u> at *7-8.

14 Plaintiffs argue that here the information was misleading because "the information reported

15 on April 19, 2011 – the value of the Alibaba Group investment – was not consistent with the

16 information disclosed on May 10, 2011 and May 12, 2011 – that the value of the Alibaba

17 Group investment had been substantially impaired."  Opp'n at 15.  First, as discussed, the

18 information reported in the April 19, 2011 statement was not "the value of the Alibaba Group

19 investment."  It was the value of Alibaba.com, and the statement that the numbers reported

20 did <u>not</u> include estimates of the value of Alibaba's privately held businesses.  These are not

21 the same.  The information in the first report (that the value was <u>not</u> included) is consistent

22 with the information in the later report (that the value had changed), in that the former does

23 not necessarily negate the later.

24          In <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1309, 1323 (2011), the Supreme

25 Court held that defendants had a duty to disclose reports that its drug Zicam might cause

26 anosmia (loss of smell) when they told the market that revenues were going to raise 50 and

27 then 80 percent, and made statements that reports Zicam caused anosmia were completely

28 unfounded and misleading.  Plaintiffs argue the case establishes that Defendants need not

utter the magic word "Alipay" to trigger their duty to disclose the Alipay restructuring. While this general statement is correct, the facts of <u>Matrixx</u> demonstrate that it does not apply here.  Here Defendants did not make any affirmative projections in the April 19, 2011 statement regarding growth in the value of the Alibaba Group investment, nor make any statements that reports regarding the value were unfounded or misleading.  In fact, the statement explicitly said it did not include the value of Alibaba Group's privately held businesses.  If the statement had included a projection of growth of revenue or value based on those businesses, or a statement that there was <u>not</u> a change in value, it might be equivalent to the situation in <u>Matrixx</u>, but as the facts exist here, that is not the case.  The Court finds that the April 19, 2011 statement was not false or misleading.

### b.    May 10, 2011 Statements

The other class period statement challenged by Plaintiffs is Yahoo's disclosure of the Alipay restructuring in its May 10, 2011 10-Q, where Yahoo stated:

> To expedite obtaining an essential regulatory license, the ownership of Alibaba Group's online payment business, Alipay, was restructured so that 100 percent of its outstanding shares are held by a Chinese domestic company which is majority owned by Alibaba Group's chief executive officer.  Alibaba Group's management and its principal shareholders, Yahoo! and Softbank Corporation, are engaged in ongoing discussions regarding the terms of the restructuring and the appropriate commercial arrangements related to the online payment business.

CAC ¶ 122; Song Decl. Ex. 9 at 8.  Plaintiffs argue this statement is misleading because it failed to disclose that the transfer took place in August 2010, that the Alibaba Group received only $46 million for the transfer, and that the VIE had been terminated.  <u>Id.</u> at ¶¶ 122-23.  Plaintiffs argue that these omitted facts concealed the fact that the Alibaba Group no longer had de facto control of Alipay, and "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  <u>Brody</u>, 280 F.3d at 1006.

Defendants argue that there is no duty to disclose all the details that an investor might want to know.  <u>In re Verity, Inc. Securities Litigation</u>, No. 99-5337, 2000 WL 1175580, at *4 (N.D. Cal. Aug. 11, 2000) (stating that the fact that information "may be been material to an investor did not, in and of itself, impose a duty on defendants to immediately disclose

those results; a duty to disclose 'does not arise from the mere possession of nonpublic market information'") (quoting <u>Chiarella v. United States</u>, 445 U.S. 222, 235 (1980)). Defendants argue that the situation is again analogous to <u>Brody</u>.  Specifically, in its second press release, the <u>Brody</u> defendant disclosed that it had received indications of interest from potential acquirers, but did not disclose specifics about those offers.  280 F.3d at 1006-07. The Ninth Circuit held the statement was not misleading because even though "the press release did not provide all the information that [the company] possessed about its possible sale, the information [it] did provide – and the reasonable inferences one could draw from that information – were entirely consistent with the more detailed explanation of the merger process" that the plaintiffs contended should have been included.  <u>Id.</u> at 1007.

Defendants argue that the May 10, 2011 10-Q made the state of affairs clear – that Alipay was no longer part of Alibaba Group and the parties were engaged in "ongoing discussions regarding the terms of the restructuring."  CAC ¶ 122.  Defendants argue the disclosure accurately summarized the state of affairs, and was "entirely consistent with the more detailed explanation" that Plaintiffs contend the statement should have included (*i.e.*, that it was transferred for only $46 million at an earlier time,[3] and that the VIE had been terminated).  Moreover, Defendants argue that once a definitive agreement regarding the disposition of Alipay was in place on July 29, 2011 (the Framework Agreement), Yahoo disclosed it, as in <u>Brody</u>.

While Plaintiffs do not make much further concerted argument on this point, it is a close question.  It is true that the statement in the 10-Q – that Alipay was restructured so that 100 percent of its outstanding shares were held by a Chinese domestic company majority owned by Alibaba Group's CEO – is consistent with the more detailed explanation of how the transfer was effected.  Still, the statement does not spell out that the Alibaba Group no longer had control of Alipay through a VIE.  Yet, the following text states that the parties were "engaged in ongoing discussions regarding the terms of the restructuring and the

---

[3] Defendants also challenge the factual accuracy of this claim, as failing to include anything to substantiate it.  In the CAC, Jack Ma, who is credited as the source of this information.  Since the Court does not find this issue dispositive, it need not address these concerns at this point.

United States District Court
For the Northern District of California

1    appropriate commercial arrangements related to the online payment business" makes it clear

2    that the transaction is potentially wide-ranging, with ongoing consequences, and a definitive

3    restructuring of the company.  Moreover, this underscores the impression that the state of

4    affairs is still in flux, mitigating the potential of the statement to mislead.  Thus, though this

5    is a close question, the Court finds that under the standard of <u>Brody</u>, the statement is not

6    necessarily misleading because the explanation given is not in conflict with the more

7    specific explanation Plaintiffs think should have been given.

8                                    **c.    Admission**

9         Plaintiffs argue that by disclosing information about the Alipay restructuring on May

10   10, 2011 and May 12, 2011, Yahoo "admitted" that it had a duty to disclose that information

11   earlier.  CAC ¶¶ 13, 65, 99, 102, 108, 113, 114, 118, 121, 123.

12        The actual text of the statement does not include an "admission."  <u>Id.</u> ¶ 122.

13   Defendants argue that Plaintiffs' contention conflicts with the case law stating there is not

14   an independent duty to disclose unless necessary to make a statement not misleading, and

15   that simply disclosing something at some point does not "admit" that it should have been

16   disclosed earlier.  <u>See, e.g.</u>, <u>Acito v. IMCERA Grp., Inc.</u>, 47 F.3d 47, 53 (2d Cir. 1995)

17   ("Mere allegations that statements in one report should have been made in earlier reports do

18   no make out a claim of securities fraud.").[4]  Moreover, the May 10, 2011 statement is simply

19   not an "admission" as Plaintiffs seem to be using the word.

20        There is not a continuous duty to disclose, and the simple fact that an issue was

21   disclosed at one point does not by itself indicate that it clearly and obviously was illegal not

22   to disclose it earlier.  The Court finds this argument unavailing.

23   _____

24        [4] Plaintiffs argue <u>Acito</u> is inapposite because it found that the omitted information would not
     have been material to investors, unlike the information about Alipay here.  Opp'n at 16.  While this is
25   an accurate summary of the case, it appears Defendants are citing it for the more general proposition
     that simply stating something at a later date does not in and of itself admit it must have been disclosed
26   earlier.  Plaintiffs appear to be making this argument when they stated that "the disclosure of the Alipay
     share transfer in the May 10, 2011 Form 10-Q was an admission that it had to be disclosed on April 19,
27   2011 because, <u>in both instances, Yahoo made representations about the value of the Alibaba Group
     investment</u> that required disclosure of the Alipay share transfer to prevent the statements from being
28   misleading."  Opp'n at 16 n.7 (emphasis added).  As discussed in great detail above, the Court does not
     agree that Yahoo made a representation about the value of the Alibaba Group investment in the April
     19, 2011 statement, and thus, this argument is unavailing.

**United States District Court**
For the Northern District of California

1

#### d.    Duty to Correct

2          Plaintiffs argue that Defendants made materially false and misleading pre-class

3   period statements[5] regarding the Alibaba Group investment, and that these gave rise to an

4   actionable and immediate duty to correct and duty to update the statements once they

5   learned of the Alipay restructuring on March 31, 2011.  The Supreme Court has not

6   addressed either a duty to correct or a duty to update.  Stransky v. Cummins Engine Co.,

7   Inc., 51 F.3d 1329, 1332 n.1 (7th Cir. 1995).  It does not appear the Ninth Circuit has

8   endorsed them either.  Still, several district courts have discussed the theories, including this

9   one.

10         "A duty to disclose may arise when a company makes a statement that it believes is

11   true but later discovers that the statement was untrue or misleading when the statement was

12   made."  Coble v. Broadvision Inc., No. 01-1969 CRB, 2011 WL 31093589, at *7 (N.D. Cal.

13   Sept. 11, 2002) (citing In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410,

14   1431 (3rd Cir. 1997) ("the error, albeit an honest one, was one that had to do with

15   information available at the time [the statement] was made and that the error in the

16   information was subsequently discovered") and Stransky v. Cummins Engine Co., 51 F.3d

17   1329, 1331 (7th Cir.1995) (a company has a duty to correct a prior statement within a

18   reasonable time when the "company makes a historical statement that, at the time made, the

19   company believed to be true, but as revealed by subsequently discovered information

20   actually was not")).

21         Plaintiff argues that Defendants had a duty to correct pre-Class Period statements on

22   March 31, 2011, when they learned of the restructuring.  Plaintiffs argue that Defendants

23   made many statements between August 2010 and February 2011 that were false and

24   misleading because they allegedly indicated that Yahoo and the Alibaba Group still had

25   stock in and control over Alipay.  Plaintiffs argue that because the stock was transferred in

26   August 2010 and the VIE terminated in January 2011 these pre-Class Period statements

27

28         [5] The pre-Class Period statements, which Plaintiffs allege were false and misleading (CAC ¶¶ 99-118), are not independently actionable.  See In re REMIC Sec. Litig., 702 F. Supp. 2d 1202, 1222-23 (S.D. Cal. 2010).

United States District Court
For the Northern District of California

1  were false and misleading when made, and Defendants had a duty to correct them when they

2  learned of the true structure of Alipay in March 2011.

3        Plaintiffs point specifically to the following information and statements as false and

4  misleading and creating a duty to correct:

5  • August 9, 2010 2Q10 Form 10-Q, included a table summarizing the Company's investments in equity interests including Alibaba Group.  CAC ¶ 99.

6  • August 9, 2010 2Q10 Form 10-Q stated: "Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance. . . .  Our stock price may fluctuate in response to a number of events and factors, such as variations in . . . the operating performance of companies in which we have an equity investment, including Yahoo Japan Corporation ("Yahoo Japan") and Alibaba Group Holding Limited ("Alibaba Group").  Id. ¶ 101.

9  • October 19, 2010 financial report, reported investments in equity interest related to Alibaba Group and the gain on the sale of Yahoo's direct investment in Alibaba.com. Id. ¶ 103.

11  • October 19, 2011 investor conference call: Morse stated, "Finally, as of September 30, the pretax value of our 35% stake in Yahoo! Japan and our 29% indirect stake in Alibaba.com was roughly $10 billion, or approximately $7.74 per share.  These figures are based on public market quotes and do not include estimates of the value of Alibaba Group's privately held businesses."  Id. ¶ 104.

13  • October 19, 2011 investor conference call: Bartz stated regarding the Alibaba investment generally, "We know there's tremendous value in the businesses they're growing.  It's an important investment and we're committed to a good, productive business relationship.  Beyond that I'm not going to speculate today or in the future on our investment with them."  Id. ¶ 105.

16  • October 20, 2011 Fox News Interview with Bartz: When a commentator asked about competing valuation numbers on Alibaba, Bartz stated, "[O]ne of the reasons you can't get a straight number is it's a private company, so there's a lot of people that are doing their best analysis of that."  Discussing the history of the investment, "[W]e partnered up with a fantastic entrepreneur named Jack Ma.  Five years later everybody is salivating because it was such a good decision and such a good investment.  So we can continue to watch this investment.  We're on the board of Alibaba.  And we're also watching what is best for the shareholders. . . .  We have a team of very strong financial experts that both work here and advise us, and we will do the right thing for the shareholder, no doubt about it."  Id. ¶ 106.

21  • November 8, 2010 3Q10 Form 10-Q reported equity investment in Alibaba, and that Yahoo had sold its direct investment in Alibaba.com.  Id. ¶ 107.

22  • November 8, 2010 3Q10 Form 10-Q included statement regarding stock price volatility: "Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance. . . .  Our stock price may fluctuate in response to a number of events and factors, such as variations in . . . the operating performance of companies in which we have an equity investment, including Yahoo Japan Corporation ("Yahoo Japan") and Alibaba Group Holding Limited ("Alibaba Group").  Id.

25  • January 25, 2011, 4Q10 and FY10 financial results, including revenue figures.  Id. ¶ 109.

26  • January 25, 2011, conference call: Morse stated, "[A]s of December 31, the pretax value of our 35% stake in Yahoo! Japan and our 29% indirect stake in Alibaba.com was roughly $10.4 billion, or approximately $7.93 per share.  These figures are based on public market quotes and do not include estimates of the value of Alibaba Group's privately held businesses, most notably TaoBao and Alipay."  Bartz stated: "For

Alibaba, I think we can sum up or point of view quite simply.  Our approximately 40% stake has been and continues to be a great investment.  And we believe it has a bright future.  Alibaba.com is growing quickly, as is Taobao, which is now China's biggest online commerce marketplace with an estimated 75% share of the market.  With eCommerce exploding in the largest country in the world, we feel our investment in Alibaba will grow in value and continue to greatly benefit our investors over time." Id.

- February 28, 2011 2010 Form 10-K reported equity investment related to the Alibaba Group and reported that "since acquiring its interest in Alibaba Group, the Company has recorded, in retained earnings, cumulative earnings in equity interests of $308 million and $350 million, respectively as of December 31, 2009 and 2010." Id. ¶ 110.  It also included the impact of the IPO of Alibaba.com. Id. ¶ 111.

- February 28, 2011 2010 Form 10-K included warning about stock price volatility: "Our stock price has been volatile historically and may continue to be volatile regardless of our operating performance. . . .  Our stock price may fluctuate in response to a number of events and factors, such as variations in . . . the operating performance of companies in which we have an equity investment, including Yahoo Japan Corporation ("Yahoo Japan") and Alibaba Group Holding Limited ("Alibaba Group"). Id. ¶ 112.

- February 16, 2011 Golden Sachs Technology and Internet Conference: Morse responded to question regarding Yahoo's failure to take its extra seat on the Alibaba Group Board by stating, "This is a right that came to us, I think it was October 24th last year, and its exists for us over the long run in perpetuity.  We have not yet placed a Director there, mostly because things are going well and we have a four-person Board.  It's Jack and it's Joe on the Alibaba side and its Jerry on our side and [Son Sonn] on the Softbank side and they work well together.  Things are going well. . . .  [Jack and Joe] run the Company day-to-day.  We're just financial investors essentially.  And so they're doing a great job. . . .  [I]t's no real hurry for us because we think things are working really well and Jack and Joe do a tremendous job." Id. ¶ 115.

- February 16, 2011 Golden Sachs Technology and Internet Conference: Morse responded to question regarding profitability versus monetizing Alibaba Group assets, "We're much more interested in the long term value creation here.  Again we don't have any operational control of this Company on the ground. . . . I think the strategy [Jack and Joe] are pursuing with regard to Taobao, with regard to Alipay, fantastic.  I think they're spot on.  We don't – we put zero pressure on them for any kind of earnings." Id. ¶ 116.

- February 16, 2011 Golden Sachs Technology and Internet Conference: Morse responded to question regarding how Yahoo would try to realize the value in Alibaba without any liquidity or governance rights, "Well, our view of Alibaba is it's an investment.  Jack and Joe are running it.  They're creating a lot of value there.  It will be worth a lot more in the coming years than it is now.  We're not all that worried, as I said earlier, about profitability or liquidity events for the moment.  What we're looking for is to have that company realize its potential." Id. ¶ 117.

Plaintiffs argue generally in the CAC that these statements were false and misleading, and thus gave rise to a duty to correct, because they did not disclose the stock transfer of Alipay to Zhejiang in August of 2010 and the termination of the VIE in January of 2011.  See, e.g., CAC ¶ 118.  In their Opposition, Plaintiffs' argue that the statements were false and misleading because "the failure to disclose the Alipay restructuring created the false

United States District Court
For the Northern District of California

1   impression that the Alibaba Group still owned and controlled Alipay."  Opp'n at 18.

2   Plaintiffs do not discuss specifically any of the alleged statements in the Opposition, nor

3   explain how the many, many statements they point to create this false impression.

4          Defendants argue that none of the statements identified in the CAC were "false or

5   misleading when the statement was made."  Coble, 2002 WL 31093589, at *7.  Defendants

6   argue that none of the financial reports Plaintiffs point to state any information about

7   Alipay, and thus, none were inaccurate when made, pointing to CAC ¶¶ 103, 109, 110

8   (Yahoo financial results); ¶¶ 99, 107, 109-11 (Yahoo's equity investment in Alibaba Group

9   and its financial results one quarter in arrears); ¶¶ 104, 109, 111 (value of Alibaba.com,

10  which expressly did not include the private holdings such as Alipay).  Defendants then argue

11  that the second group of statements merely expressed enthusiasm and optimism about

12  Yahoo's Alibaba Group investment generally, including opinions that Alibaba's privately

13  held businesses, including Taobao, Alipay, and China Yahoo were growing in value, and

14  supporting the Alibaba Group's "fantastic" strategy for those businesses.  Id. ¶¶ 105, 106,

15  109, 115-117.

16         Defendants argue that Plaintiffs fail to plead any facts showing these opinions were

17  incorrect or unreasonable at the time the statements were made, and thus, the duty to correct

18  does not apply.  Moreover, Defendants argue that courts have held vague expressions of

19  enthusiasm are immaterial as a matter of law.  See Cutera Securities Litig., 610 F.3d at

20  1111; Philco, 2011 WL 500694, at *6.  Finally, Defendants argue that Plaintiffs' contention

21  that statements are misleading because they created the false impression that the Alibaba

22  Group continued to own and control Alipay after August 2010 and triggered a duty to

23  correct, is problematic because the Alibaba Group did continue to have "de facto" control of

24  Alipay until the first quarter of 2011, pursuant to the VIE.

25         The Court agrees with Defendants in many respects regarding the nature of these

26  statements at the time they were made.  First, the general financial results of Yahoo did not

27  discuss the value of Alipay.  Plaintiff makes no argument as to how the specific financial

28  results of Yahoo as a whole were inaccurate when made.  Plaintiff must plead how and why

23

United States District Court
For the Northern District of California

1    the statements were false and misleading with particularity, and has made no specific

2    argument regarding the general financial records of Yahoo, and the equity investment in the

3    Alibaba Group.  Second, the reports of Yahoo's stake in Alibaba.com expressly did not

4    include the value of Alibaba Group's private holdings.  This point is discussed in detail

5    above with regards to the April 19, 2011 statement (these statements are identical to the

6    April 19, 2011 statement).  Thus, the Court concludes that these statement were not false or

7    misleading when made.

8         Third, the Court agrees with Defendants generally about the expressions of

9    enthusiasm.  In <u>Philco</u>, this Court discussed generally the non-actionable nature of vague

10   expressions of enthusiasm: "[T]erms like 'strong' and 'spectacular' are not actionable under

11   the securities laws."  2011 WL 500694, at *6.  <u>See also</u> <u>Glen Holly Entm't Inc. v. Tektronix</u>

12   <u>Inc.</u>, 352 F.3d 367, 379 (9th Cir. 2003) (reasonable consumer cannot rely on "generalized,

13   vague and unspecific assertions, constituting mere 'puffery'"); <u>In re Copper Mountain Sec.</u>

14   <u>Litig.</u>, 311 F. Supp. 2d 857, 868–69 (N.D. Cal. 2004) (holding that words like "strong" and

15   "very positive" are not actionable, noting that "vague statements are not actionable because

16   'they are considered immaterial and discounted by the market' and because 'reasonable

17   investors do not consider 'soft' statements or loose predictions important in making

18   investment decisions").  Plaintiffs argue the statements here are different because they were

19   not "vague" or a "subjective assessment" like in <u>Cutera</u>, but rather, reinforced the false

20   impression that the Alibaba Group still owned Alipay, citing <u>Warshaw v. Xoma Corp.</u>, 74

21   F.3d 955, 959 (9th Cir. 1996) ("[E]ven optimistic statements, when taken in context, might

22   constitute a basis for a claim.").

23        Still, Plaintiffs fail to point to any specifics to support how or why these statements

24   fall into that category.  For example, in <u>Warshaw</u>, the Court ruled that the statement

25   "everything was going to be fine" and other expressions of optimism were actionable given

26   that the statements were made in response to concerns about FDA approval of a specific

27   drug (defendant's only product) at a time the defendants allegedly knew of problems that

28   their product "would never be approved by the FDA."  74 F.3d at 959.  Here, Plaintiff does

1    not point in the Opposition to any statements that were similarly specific to the situation in

2    Warshaw.

3          The following statements appear to fall into the category of general statements of

4    optimism regarding the investment in the Alibaba Group.  On the October 19, 2011 investor

5    conference call Bartz stated regarding the Alibaba investment generally, "We know there's

6    tremendous value in the businesses they're growing.  It's an important investment and we're

7    committed to a good, productive business relationship.  Beyond that I'm not going to

8    speculate today or in the future on our investment with them."  CAC ¶ 105.  "Tremendous

9    value" and "important investment" are general and mere puffery.  On October 20, 2011 in a

10   Fox News Interview Bartz stated in discussing the history of the investment in the Alibaba

11   Group, "[W]e partnered up with a fantastic entrepreneur named Jack Ma.  Five years later

12   everybody is salivating because it was such a good decision and such a good investment.  So

13   we can continue to watch this investment.  We're on the board of Alibaba.  And we're also

14   watching what is best for the shareholders."  Id. ¶ 106.  Here, Bartz is characterizing the

15   CEO as "fantastic," and stating that investing in the Alibaba Group was "such a good

16   decision and such a good investment."  Again, these are general statements of optimism

17   regarding the leadership and original decision to invest in the Alibaba Group.  They do not

18   say anything about the actual value, or a change in value, or anything of that nature.

19   Moreover, at that point, the Alibaba Group still controlled Alipay through a VIE.

20         The Court does not find that these are actionable statements.  For example, in In re

21   Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), aff'd, 95 F.3d 922 (9th

22   Cir. 1996), the court held as non-actionable puffing the phrases "'we're doing well and I

23   think we have a great future,' 'business will be good this year . . .  we expect the second half

24   of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be

25   stronger than the first . . .,' 'everything is clicking [for the 1990s] . . . new products are

26   coming in a wave, not in a trickle . . . old products are doing very well' and that 'I am

27   optimistic about Syntex's performance during this decade.'"  The types of statements

28   challenged here fall into this category.  Adjectives such as "fantastic," "tremendous," and

United States District Court
For the Northern District of California

1   "good" do not rise to a level of materiality that would be actionable when taken as a general

2   statement of enthusiasm by the company's executives.

3       Some of the later statements are a closer question.  On a January 25, 2011,

4   conference call Bartz stated, "For Alibaba, I think we can sum up or point of view quite

5   simply.  Our approximately 40% stake has been and continues to be a great investment.

6   And we believe it has a bright future.  Alibaba.com is growing quickly, as is Taobao, which

7   is now China's biggest online commerce marketplace with an estimated 75% share of the

8   market.  With eCommerce exploding in the largest country in the world, we feel our

9   investment in Alibaba will grow in value and continue to greatly benefit our investors over

10  time."  Id.  Yet, the Court finds this statement not misleading.  First, this includes elements

11  of mere puffery, such as "great investment" and "bright future."  Second, it does not

12  mention Alipay.  The actual statement points to the specific reasons that Alibaba is likely to

13  grow in value – Taobao and Alibaba.com, which are the topics of the discussion.  Thus, the

14  omission of Alipay is not misleading, even more so given the "puffery" nature of the

15  statement generally.

16      On February 16, 2011, at the Goldman Sachs Technology and Internet Conference

17  Defendant Morse responded to a question regarding Yahoo's failure to take its extra seat on

18  the Alibaba Group Board by speaking generally of how Yahoo was happy with the way the

19  Company was being run already.  Morse stated, "We have not yet placed a Director there,

20  mostly because things are going well and we have a four-person Board.  It's Jack and it's

21  Joe on the Alibaba side and its Jerry on our side and [Son Sonn] on the Softbank side and

22  they work well together.  Things are going well. . . . [Jack and Joe] run the Company day-to-

23  day. . . .  And so they're doing a great job. . . .  [I]t's no real hurry for us because we think

24  things are working really well and Jack and Joe do a tremendous job."  CAC ¶ 115.

25  Arguably, this statement could be misleading because at the time Jack Ma had terminated

26  the VIE with regards to Alipay, and thus, would not necessarily, in the view of Yahoo be

27  doing a "tremendous job" running the Alibaba Group.  Still, Plaintiffs do not specifically

28

1    allege how such general statements of approval ("tremendous") created the specific

2    misleading impression that Alibaba still had control over Alipay.

3            At the same conference Morse responded to a question regarding profitability versus

4    monetizing Alibaba Group assets by stating, "We're much more interested in the long term

5    value creation here.  Again we don't have any operational control of this Company on the

6    ground. . . .  I think the strategy [Jack and Joe] are pursuing with regard to Taobao, with

7    regard to Alipay, fantastic.  I think they're spot on.  We don't – we put zero pressure on

8    them for any kind of earnings."  CAC ¶ 116.  He continued, in response to a question

9    regarding how Yahoo would try to realize the value in Alibaba without having any liquidity

10   or governance rights by stating, "Well, our view of Alibaba is it's an investment.  Jack and

11   Joe are running it.  They're creating a lot of value there.  It will be worth a lot more in the

12   coming years than it is now.  We're not all that worried, as I said earlier, about profitability

13   or liquidity events for the moment.  What we're looking for is to have that company realize

14   its potential."  Id. ¶ 117.

15           While the statements are still general sentiments of optimism regarding the

16   investment in Alibaba as a whole, Morse specifically states that the strategy being pursued

17   with regards to Alipay is "fantastic."  This is one of the very few specific mentions of

18   Alipay and the direction that company is taking generally.  At the time that the statement

19   was made, the stock had been transferred and the VIE had been terminated.  Thus, under the

20   direction of Jack Ma, the Alibaba Group had lost its stock in, and its de facto control over,

21   Alipay.  Stating that the strategy Ma was pursuing with regards to Alipay was "fantastic"

22   was at least arguably misleading given that Ma had unilaterally terminated the VIE giving

23   Yahoo any de facto control over the company.  Finding out about the termination of the VIE

24   could give rise to a duty to correct the statement that the strategy being pursued for Alipay

25   was "fantastic" for Yahoo.

26           This is also true of the second statement that Jack and Joe were "creating a lot of

27   value there [the Alibaba Group generally].  It will be worth a lot more in the coming years

28   than it is now."  CAC ¶ 117.  One the one hand, this is a general statement of optimism

United States District Court
For the Northern District of California

1    regarding the future of the Alibaba Group on the whole.  On the other hand, Alipay is a

2    large part of the privately held value of the Alibaba Group, and at the time the statement was

3    made, the Alibaba Group no longer had either ownership or de facto control over Alipay any

4    longer.  Thus, it is arguably a misleading statement that Jack and Joe were "creating a lot of

5    value" in Alibaba at the time that they had been responsible for the Group losing control

6    over a major asset of the Company.  Similarly, the statement that the Alibaba Group would

7    "be worth a lot more in the coming years" is potentially misleading given that it no longer

8    had de facto control over a major asset, and thus, the asset would no longer be contributing

9    to a growth in value.  On the other hand, the statement is about the Alibaba Group generally,

10   which could grow in value based upon a growth in value of the other company assets

11   regardless of Alipay.  And the statement is not particularly specific, nor necessarily tied to

12   the prior discussion specifically of monetizing Alipay (it is not clear from the CAC the exact

13   chronology of the comments).  Still, the Court finds these two statements gave rise to a duty

14   correct.  Yet, as discussed in detail below, the Court finds them non-actionable because it

15   finds the delay in correction reasonable.

16                    **e.      Duty to Update**

17          The duty to update, in contrast to the duty to correct, concerns forward-looking

18   statements that, "although reasonable at the time made, become misleading when viewed in

19   the context of subsequent events." Burlington Coat Factory, 114 F.3d at 1431.  When that

20   happens, a "company must correct the prior statement within a reasonable time." Stransky,

21   51 F.3d at 1331.  Again, neither the Supreme Court nor the Ninth Circuit has affirmatively

22   recognized the duty to update.  See In re Foxhollow Technologies, Inc. Securities Litig., 359

23   Fed. App'x 802, 804 (9th Cir. 2009) (declining to decide that "novel question of law").  In

24   the circuits that have found such a duty to update true statements, the courts have said "that

25   it applies only to statements that are clear, factual, and forward-looking, such that some

26   continuing representation remains alive in the minds of investors when circumstances

27   change." Id. at 805 (citing cases).

28

United States District Court
For the Northern District of California

1    Defendants argue that recent decisions by the Supreme Court and the Ninth Circuit

2 arguably undercut the existence of such a duty. <u>Matrixx</u> emphasized that liability under

3 Section 10(b) and Rule 10b-5 arises at the time when and based on the "'circumstances

4 under which [statements] were made.'" 131 S. Ct. at 1321 (quoting 17 C.F.R. § 240.10b-

5 5(b)). The Ninth Circuit in <u>Reese v. BP Exploration (Alaska) Inc.</u> similarly explained that

6 "'<u>liability cannot be imposed on the basis of subsequent events.</u>'" 643 F.3d 681, 693 (9th

7 Cir. 2011) (emphasis added; citation omitted). Defendants argue that these rulings follow

8 from Rule 10b-5 itself, which "implicitly precludes basing liability on circumstances that

9 arise <u>after</u> the speaker makes the statement." <u>Stransky</u>, 51 F.3d at 1332, 1333 n.9 (emphasis

10 added).

11    The Court agrees with the sentiment in <u>Foxhollow</u> that it is not necessary to decide

12 whether such a duty actually exists at this time because Plaintiffs have failed to adequately

13 allege statements that would give rise to such a duty if it did exist.

14    Defendants argue that even if such a duty exists, it only applies to those earlier

15 statements that are "clear, factual, and forward-looking, such that some continuing

16 representation remains alive in the minds of investors when circumstances change."

17 <u>Foxhollow</u>, 359 Fed. App'x 802, 805. They argue that Plaintiffs allege no such statements

18 here, pointing only to historical statements (CAC ¶¶ 42, 99, 103, 104, 107, 109-11) and

19 vague expressions of optimism (<u>Id.</u> ¶¶ 43, 105, 106, 109, 115-17). Defendants then argue

20 that "[n]o duty to update an historical statement can logically exist" because "[b]y definition

21 an historical statement is addressing only matters at the time of the statement." <u>Stransky</u>, 51

22 F.3d at 1332 n.3. Likewise, there is no "duty to update vague statements of optimism or

23 expressions of opinion." <u>IBM</u>, 163 F.3d at 110. There is no duty to update where, as here, a

24 company's disclosures were "simply silent on the subject" at issue. <u>Oran</u>, 226 F.3d at 286.

25    Plaintiffs only response to these arguments is one sentence: "Defendants did,

26 however, have a duty to update their positive statements about the Alibaba Group

27 investment made before the August 2010 Alipay restructuring." Opp'n at 20. Plaintiffs do

28 not point to what statements they argue required updating.

United States District Court
For the Northern District of California

1    Under the Court's examination, it appears that they would have pointed to the

2    statements in paragraph 43 of the CAC.  On the April 22, 2008 conference call the

3    Company's then-CFO stated the market value of Yahoo's direct and indirect interest in

4    publicly traded securities and stated that the figures did "not include estimates of the

5    Alibaba Group's other privately held businesses, such as [Taobao], Alipay, and China

6    Yahoo!, which we believe provides significant additional value."  CAC ¶ 43.  On four

7    subsequent calls during 2008-2009 Morse and the previous CFO made similar statements –

8    reporting the value of the publicly traded assets, and then stating that the figures did not

9    include estimates of the Alibaba Group's privately held businesses (sometimes naming

10   Alipay specifically, and sometimes not), which the Company believed provided significant

11   extra value.  Id.

12       Still, the Court does not find that these statements would give rise to a duty to update.

13   First, these statements are historical opinions of the value of the investment at the time the

14   statement was made.  Additionally, they are vague expressions of optimism, in that all that

15   was said was that the privately held businesses were believed to provide "significant" extra

16   value.  Second, they do not appear to be "clear, factual, and forward-looking" in that they

17   are not specific, do not include actual factual numbers regarding value, and are not forward-

18   looking, but rather, represent the idea of value at the time they were made.

19       The one statement that perhaps might have some traction was made during the

20   October 28, 2009 analyst meeting where Morse discussed the investment in Yahoo! Japan

21   and the Alibaba Group generally.  CAC ¶ 43.  He stated, "We think they're terrific assets

22   that are going to be worth a whole lot more in the future than they are today. . . .  We have

23   terrific agreements with them that actually bring dollars into our coffers every quarter.  So

24   that's – it's an investment that's paying off nicely."  Id.  Arguably, the statement that Yahoo

25   had agreements that "actually bring dollars into our coffers every quarter" could be a

26   factual, forward-looking statement.  It is not necessarily clear, as there is no indication if

27   Morse is speaking about Yahoo! Japan, Alibaba generally, Alibaba.com or some other

28   Alibaba Group company.  Moreover, it is just barely factual, seeming to also ride the line of

30

**United States District Court**
For the Northern District of California

an expression of optimism.  Finally, it is not clear how a revelation that the stock in Alipay specifically had been transferred would necessarily be seen as an "update" of this statement. Thus, particularly given Plaintiffs' failure to articulate any facts or theories to support this claim in its Opposition, the Court finds that there were no statements that would trigger the duty to update.

### f.      Disclosed in a Reasonable Time Period

Defendants argue that even if there is a duty to correct or update that does apply to some statement they made, liability does not arise where disclosure was made within a "reasonable time."  Stransky, 51 F.3d at 1331.  Defendants argue that they disclosed the Alipay restructuring approximately five weeks after receiving notice of it, and that this was within a reasonable time because it was disclosed in Yahoo's "10-Q after discussions with Alibaba Group and obtaining a better understanding of this complex situation."  Song Decl. Ex. 10 at 1; see also Song Decl. Ex. 11 at 2-3.

Courts have found that taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent.  As Higginbotham v. Baxter Int'l Inc., 495 F.3d 753 (7th Cir. 2007), explains:

> Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. [Defendants] might more plausibly have been accused of deceiving investors had managers called a press conference before completing the steps necessary to determine just what happened [at a foreign subsidiary].
>
> Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.

Id. at 760-61 (affirming dismissal; holding that disclosing accounting errors at Brazilian subsidiary two months after discovery was a "reasonable time"); see also Slayton v. Am. Express Co., 604 F.3d 758, 763-64, 774, 777 (2d Cir. 2010) (affirming dismissal; taking two months to "ascertain and disclose future losses" is "'both proper and lawful'") (citation omitted); N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 57-58 & n.23 (1st Cir. 2008) (affirming dismissal and finding that it was reasonable to investigate before disclosing).

**United States District Court**
For the Northern District of California

Moreover, Defendants argue that when it disclosed the restructuring in the 10-Q on May 10, it also disclosed that it was in "ongoing discussions" with the Alibaba Group and others "regarding the terms of the restructuring and the appropriate commercial arrangements." CAC ¶ 122; Song Decl. Ex. 9 at 8. In its press release two days later, Yahoo reiterated that it "continues to work closely with Alibaba and Softbank to protect economic value for all interested parties," and that "ongoing negotiations among all of the parties provide the best opportunity to achieve an outcome in the best interests of all stakeholders." Song Decl. Ex. 10 at 1. Again, on four separate occasions between May 13 and July 19, Yahoo provided updates on the progress of the negotiations. CAC ¶¶ 85, 97, 131, 146. On July 29, 2011, Yahoo disclosed that it, the Alibaba Group, and others had entered into the Framework Agreement, which compensated the Alibaba Group for Alipay and resolved other outstanding issues. Id. ¶ 132; Song Decl. Ex. 12 at 2, 25.

Plaintiffs respond that the cases cited by Defendants are distinguishable because "in this case there was no doubt about the accuracy of the bad news or the effect of the unilateral restructuring. Alipay was gone, the Alibaba Group received just $46 million for this $6 billion company and the only issue was whether Yahoo would receive additional consideration." Opp'n at 20. Essentially, Plaintiffs argue that investigation was reasonable in the cases cited by Defendants, but was not reasonable here. For example, in Higginbotham, the defendant learned about a foreign subsidiary reporting fictitious sales results, and waited two months to disclose that it would have to restate its financial results. The Court found it reasonable to conduct an investigation because the defendant could not simply assume that the initial report of bad news was accurate. 495 F.3d at 758. Plaintiffs argue that in this case there was no doubt about the accuracy of the bad news here, and thus, no need to conduct an investigation.

Arguably, the fact that the parties were starting negotiations points to the fact that investigation would be helpful prior to and during those negotiations. Moreover, it is not inconceivable that with the regulatory situation in China Yahoo would want to take time to figure out the truth and implications of the news that Jack Ma had unilaterally terminated the

United States District Court
For the Northern District of California

1   VIE.  Moreover, likely there were many avenues of response open to Yahoo following

2   receipt of this news, and it was reasonable to explore these avenues and come to a tentative

3   decision prior to announcing the news to the market.  Thus, the Court finds that the gap in

4   time was reasonable.  This is supported moreover, by the lack of any "smoking gun" false or

5   misleading statements, which supports taking the time to figure out the situation and disclose

6   it during a regular periodic disclosure.

7        Thus, Plaintiffs have not sufficiently stated a claim that most of the statements were

8   false and misleading, or that most of the statements gave rise to a duty to correct or update.

9   To the extent that some of Morse's comments may have given rise to a duty to correct, the

10  disclosure was made in a reasonable time period.  Thus, the Court finds that Plaintiffs have

11  failed to state a claim.

12       **B.      Section 20(a)**

13       Section 20(a) allows recovery against persons who exercise control over primary

14  violators of Section 10(b).  <u>Zucco</u>, 552 F.3d at 990.  Since the Court finds that Plaintiffs

15  failed to plead a primary violation 10(b), the Court finds that the Section 20(a) claim also

16  fails. <u>Id.</u>

17  **IV.   CONCLUSION**

18       For the forgoing reasons the Court GRANTS the motion to dismiss.

19       **IT IS SO ORDERED.**

20

21

22  Dated: August 10, 2012                    _____
                                             CHARLES  R. BREYER
23                                           UNITED STATES DISTRICT JUDGE

24

25

26

27

28